1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10    BRYAN MAZZA,                              No.  2:14-cv-0874 TLN AC P

11                   Plaintiff,

12         v.

13    L. AUSTIN, et al.,                        FINDINGS AND RECOMMENDATIONS

14                   Defendants.

15

16    **I.      Introduction**

17          Plaintiff Bryan Mazza is a state prisoner incarcerated at California State Prison Solano

18    (CSP-SOL), under the authority of the California Department of Corrections and Rehabilitation

19    (CDCR).  Plaintiff proceeds pro se and in forma pauperis with his "Operative Complaint &

20    Addendum" ("complaint") as consolidated by the court on October 28, 2015.  See ECF No. 38.

21    Plaintiff pursues Eighth Amendment claims under 42 U.S.C. § 1983 against defendants Lipson,

22    McCue, Kuersten, Austin and Tan on the ground they were deliberately indifferent to plaintiff's

23    serious medical needs.

24          Currently pending are motions for summary judgment filed separately by defendant Tan,

25    ECF No. 143, and the remaining defendants Lipson, McCue, Kuersten and Austin, ECF No. 144.

26    These matters are referred to the undersigned United States Magistrate Judge pursuant to 28

27    U.S.C. § 636(b)(1)(B) and Local Rule 302(c).  For the reasons set forth below, the undersigned

28    recommends that both motions be granted.

1

## II.     Background

This action proceeds on plaintiff's Eighth Amendment claims that defendants were deliberately indifferent to his serious medical needs when they tapered, discontinued and/or refused to prescribe morphine to treat plaintiff's chronic pain.  See Compl., ECF No. 38 at 3-8, 132-33.[1]  Plaintiff contends that he is "is a chronic care, high risk patient who suffers from several orthopedic maladies: degenerative joint disease in both hips; arthritis in most of his major primary mover joints; arthritis in lumbar spine; fractures, bone spurring, and ligament tears in both elbows."  Id. at 3-4 (with minor edits).  Plaintiff alleges that he requires effective pain medication to function on a daily basis.  Plaintiff contends that defendants' actions were inconsistent with the recommendations of his specialists, neurologist Dr. Mitchell and rheumatologist Dr. McAlpine.  As a result, plaintiff alleges that he experiences debilitating pain and depression and is unable to participate in rehabilitative physical activities.  Id. at 7-8.  Plaintiff seeks compensatory and punitive damages and injunctive relief.  Id. at 133.

## III.     Legal Standards

### A.     Motions for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the

---

[1]  Page references to filed documents reflect the electronic pagination accorded by the court's Case Management/Electronic Case Filing (CM/ECF) system, not the original pagination of the documents.

1  adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56

2  (c)(1)(A), (B).

3       When the non-moving party bears the burden of proof at trial, "the moving party need

4  only prove that there is an absence of evidence to support the nonmoving party's case."  Oracle

5  Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

6  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

7  against a party who fails to make a showing sufficient to establish the existence of an element

8  essential to that party's case, and on which that party will bear the burden of proof at trial.  See

9  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

10  nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

11  circumstance, summary judgment should be granted, "so long as whatever is before the district

12  court demonstrates that the standard for entry of summary judgment ... is satisfied."  Id. at 323.

13       If the moving party meets its initial responsibility, the burden then shifts to the opposing

14  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

15  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

16  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

17  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

18  admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

19  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  Moreover, "[a] [p]laintiff's verified complaint

20  may be considered as an affidavit in opposition to summary judgment if it is based on personal

21  knowledge and sets forth specific facts admissible in evidence."  Lopez v. Smith, 203 F.3d 1122,

22  1132 n.14 (9th Cir. 2000) (en banc).[2]

23  _____

24  [2]  In addition, in considering a dispositive motion or opposition thereto in the case of a pro se
    plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's
25  verified complaint or opposition.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)
    (evidence which could be made admissible at trial may be considered on summary judgment); see
26  also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district
    court abused its discretion in not considering plaintiff's evidence at summary judgment, "which
27  consisted primarily of litigation and administrative documents involving another prison and
    letters from other prisoners" which evidence could be made admissible at trial through the other
28  inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions

1   The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

2   might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby,

3   Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809

4   F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a

5   reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers,

6   Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

7   In applying these rules, district courts must "construe liberally motion papers and

8   pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly."

9   Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  "This rule exempts pro se inmates from

10   strict compliance with the summary judgment rules, but it does not exempt them from *all*

11   compliance."  Soto v. Sweetman, 882 F.3d 865, 872 (9th Cir.) (original emphasis) (inmates

12   remain obliged "to identify or submit some competent evidence" supporting their claims), cert.

13   denied, 139 S. Ct. 480 (2018).

**B.      Deliberate Indifference to Serious Medical Needs**

14

15   "[D]eliberate indifference to serious medical needs of prisoners constitutes the

16   unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment.  This is true

17   whether the indifference is manifested by prison doctors in their response to the prisoner's needs

18   or by prison guards in intentionally denying or delaying access to medical care or intentionally

19   interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)

20   (internal citations, punctuation and quotation marks omitted).  To prevail, plaintiff must show

21   both that his medical needs were objectively serious, and that defendant possessed a sufficiently

22   culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

23   "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

24   further significant injury or the "unnecessary and wanton infliction of pain."'  McGuckin v.

25   Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting Estelle, 429 U.S. at 104), overruled on other

26   grounds by WMX Techs. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  Examples of

27

28   may be cited not for precedent but to indicate how the Court of Appeals may apply existing
precedent).

4

1    a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient

2    would find important and worthy of comment or treatment; the presence of a medical condition

3    that significantly affects an individual's daily activities; or the existence of chronic and

4    substantial pain." Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir.

5    1990); Hunt v. Dental Dep't, 865 F.2d 198, 200-01 (9th Cir. 1989)).

6    　　　The requisite state of mind is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1,

7    5 (1992) (citation omitted). This requires a showing greater than medical malpractice,

8    negligence, or civil recklessness. Farmer v. Brennan, 511 U.S. 825, 837 & n.5 (1994); Wood,

9    900 F.2d at 1334. To establish deliberate indifference, a prisoner must demonstrate that the

10   defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official

11   must both be aware of the facts from which the inference could be drawn that a substantial risk of

12   serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. It is not

13   enough that a reasonable person would have known of the risk or that a defendant should have

14   known of the risk. Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004). Rather, deliberate

15   indifference is established only where the defendant subjectively knows of a risk and deliberately

16   disregards it, causing harm. Id.; Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

17   　　　Whether a defendant had requisite knowledge of a substantial risk of harm is a question of

18   fact. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very

19   fact that the risk was obvious. The inference of knowledge from an obvious risk has been

20   described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the

21   burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by

22   virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ."

23   Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-

24   43) (internal quotation marks omitted).

25   　　　When the risk is not obvious, the requisite knowledge may still be inferred by evidence

26   showing that the defendant refused to verify underlying facts or declined to confirm inferences

27   that he strongly suspected to be true. Farmer, 511 U.S. at 842. Prisons officials may avoid

28   liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently

1    substantial danger and that they were therefore unaware of a danger, or that they knew the

2    underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was

3    insubstantial or nonexistent."  Id. at 844; see also Wilson, 501 U.S. at 298.

4         **IV.**     **Evidentiary Matters**

5             **A.**     **Request for Judicial Notice of Plaintiff's Criminal History**

6       Defendants ask this court to take judicial notice of superior court records documenting

7    plaintiff's criminal history.  ECF No. 145.  Plaintiff has not expressly opposed this request nor

8    disputed the authenticity of the proffered documents.  Under Federal Rule of Evidence 201, this

9    Court may take judicial notice of matters of public record.  See United States v. Wilson, 631 F.2d

10   118, 119 (9th Cir. 1980) ("a court may take judicial notice of its own records in other cases, as

11   well as the records of an inferior court in other cases.").  This authority is limited by the

12   requirement that the subject records be "directly related" to the matters at issue in the case at bar.

13   U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.

14   1992).

15       The clear impetus for defendants' request lies in plaintiff's repeated disavowals of

16   substance abuse at his February 5, 2019 deposition.  The deposition transcript is replete with

17   plaintiff's denials and lack of recollection, and statements that his criminal history is irrelevant to

18   this civil action.  See generally ECF No. 146.  Defendants argue that the proffered records

19   "chronicle Mazza's decades-long struggle with substance abuse" and thereby "undermine

20   Mazza's core allegation of misconduct in this action and directly inform the determination of

21   whether the decision to discontinue his morphine prescription met the community standard of

22   care."  ECF No. 145 at1-2.

23       Plaintiff's criminal history may not be relied on to find that plaintiff's deposition

24   testimony was false or misleading.  "Credibility determinations, the weighing of the evidence,

25   and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,

26   whether he is ruling on a motion for summary judgment or for a directed verdict.  The evidence of

27   the non-movant is to be believed, and all *justifiable* inferences are to be drawn in his favor."

28   Anderson, 477 U.S. at 255 (emphasis added) (citation omitted).  Evidence of plaintiff's prior

1  conduct may not be used to prove that he acted the same way in prison, as a matter of character.

2  See Fed. R. Evid. 404(b).  Whether defendant medical providers were deliberately indifferent to

3  plaintiff's serious medical needs depends on whether their chosen courses of treatment were

4  medically acceptable in light of the risks and benefits to plaintiff as then known to defendants.

5  Toguchi, 391 F.3d at 1057; Jett, 439 F.3d at 1096.  Accordingly, evidence of plaintiff's substance

6  abuse history—including evidence that corroborates statements in prison plaintiff's medical

7  records, upon which defendants relied to reach their treatment decisions—may be relevant in

8  determining the appropriateness of those decisions.

9       Plaintiff's entire criminal history is not "directly related" to the issues in this case.

10  Borneo, 971 F.2d at 248.  Only plaintiff's instant commitment offenses and his subsequent

11  challenge to his three-strikes sentence will be considered, and only for the limited purpose noted.

12  Therefore, the court grants defendants' request to take judicial notice of Defendants' Exhibit A

13  and grants in part their request to judicially notice Defendants' Exhibit B.  The court denies the

14  request as to Defendants' Exhibits C through F.

15       Defendants' Exhibit A contains an Abstract of Judgment, Minute Order, and Information

16  from Napa County Superior Court Case No. CR125195, which reflect plaintiff's June 2006 jury

17  conviction for, in pertinent part, possession of a controlled substance (methamphetamine) and his

18  current 25-year to life sentence under California's three-strikes law.  ECF No. 145 at 7-15.

19       Defendants' Exhibit B contains an attorney-prepared motion to dismiss plaintiff's three-

20  strikes sentence filed September 2009 in the Contra Costa County Superior Court, Case No. 5-

21  061526-0.  ECF No. 145 at 16-33.  The motion states in pertinent part that plaintiff's "current

22  convictions [] stem without question from an addiction to controlled substances, most notably

23  cocaine and methamphetamine."  Id. at 21.  The court denies defendants' request to judicially

24  notice two attachments to the motion, a June 1989 psychiatric evaluation and a March 2006

25  psychological evaluation, id. at 34-44.

26         **B.**    **<u>Prison Yard Surveillance Video</u>**

27       Defendants have lodged a CD reflecting footage from a video-surveillance camera that

28  shows plaintiff in CSP-SOL's Facility B exercise yard (previously "Yard 2") on July 30, 2015 at

7:50 p.m.  CSP-SOL Sergeant C. Medina filed a declaration authenticating the footage, which he recorded from the surveillance system with a portable digital camera and reviewed after the footage was transferred to the CD.  See Medina Decl. (ECF No. 144-4 at 161-63); Ganson Decl. (chain of custody) (ECF No. 144-3 at 2).  Defendants lodged the CD, now designated as their Exhibit S, noting that it was "among the evidence that Dr. Barnett considered when rendering his expert medical-opinion testimony."  ECF No. 146 at 1; see also ECF No. 144-4 at 2.  Defendants state that "[a] copy of the video was provided to nonparty prison officials to allow Mazza to view it."  ECF No. 146 at 1 n.1.

The exhibit's authentication satisfies Federal Rule of Evidence 901.  Moreover, plaintiff does not object to the introduction of the CD nor assert that his activities reflected therein are inaccurate.  Facts reflected in an authenticated video are admissible on summary judgment.  Scott v. Harris, 550 U.S. 372, 380-81 (2007) (finding plaintiff's version of the facts incredible because "blatantly contradicted" by the submitted video).

The undersigned has reviewed the video, which is just under five minutes in length.  Minimally spliced, it shows plaintiff exercising for a total of approximately eight minutes, as demonstrated by the date and time counter at the bottom of the screen.  The video shows plaintiff, using a hyperextension bench, perform nine sit ups and then, with interval rests, fifty back extensions.  Plaintiff's movements appear agile.

### C.   Defendants' Objections to Plaintiff's Evidence

Defendant Tan's objection to plaintiff's Exhibit 27, a 2011 California Medical Board Stipulated Settlement and Order (Compl. ECF No. 38 at 149-62) is sustained.  As Dr. Tan asserts, ECF No. 161 at 1, this matter is irrelevant to the claims in this action.  See Fed. R. Evid. 401.

Defendants' objections to the two inmate declarations submitted by plaintiff (Ex. A to Pl. Oppo., ECF No. 154 at 4-6), are sustained in part.  As defendants assert, ECF No. 163-2 at 1-2, the relevance and admissibility of these declarations are limited by Fed. R. Civ. P. 56(c)(4).[3]  So

---

[3]  Federal Rule of Civil Procedure 56(c)(4) provides:  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

1    limited, the substance of these declarations is included in the factual summaries set forth below.[4]

2         Defendants' objections to the "Health Care Services Request Forms" (Form CDC 7362)

3    submitted by plaintiff, dated April 2014 to January 2015 (Ex. B to Pl. Oppo., ECF No. 154 at 7-

4    19), are overruled.  Contrary to defendants' argument that these forms are both "immaterial and

5    irrelevant," ECF No. 163-2 at 3, plaintiff's statements in these documents are relevant to his

6    alleged pain symptoms during this period, as set forth below.

7         Defendants' objections to a 2018 letter prepared by Prison Law Office attorneys and

8    addressed to Clark Kelso (Ex. C to Pl. Oppo., ECF No. 154 at 20-5) are sustained.  Clark Kelso is

9    the Court-Appointed Federal Receiver overseeing California's Correctional Health Care Services

10   (CCHCS).  See Plata v. Schwarzenegger, Case No. 3:01-1351 JST (N.D. Cal. Jan. 23, 2008)

11   (ECF No. 1063 (citing ECF No. 473)).  The subject letter, which conveys 2015 and 2017 findings

12   by the Office of the Inspector General (OIG) concerning the delegation of medical care at CSP-

13   SOL, is not relevant to the claims in this action.  See Fed. R. Evid. 401.

14        Defendants next object to the fact that plaintiff attached a copy of his complaint and

15   exhibits to his Opposition Memorandum (Ex. D to Oppo., ECF No. 154 at 29-201).  The

16   objection is sustained.  The court considers these allegations and exhibits only as presented in the

17   operative complaint (ECF No. 38).

18        Defendants object to Exhibit 24 of plaintiff's complaint (Compl., ECF No. 38 at 141-3;

19   see also Oppo., ECF No. 154 at 165-78).  Entitled "Corrospondence [sic] Control," this exhibit

20   sets forth the September 26, 2012 response of CCHCS's Controlled Correspondence Unit (CCU)

21   to plaintiff's June 19, 2012 personal letter to Federal Receiver Clark Kelso.  Plaintiff's letter

22   complained of inadequate medical care and stated that plaintiff had considered suicide.  The letter

23   resulted in an immediate mental health evaluation of plaintiff which concluded there was no

24   imminent concern for plaintiff's safety or mental health status.  Shortly thereafter, a manager with

25   the CCU sent plaintiff the subject September 26, 2012 response.  Defendants contend this

26

27   [4] As correctly noted by defendant Tan, "[t]he only two independent declarations presented by
     Mazza . . .support [his] contentions about pain but do nothing to contribute to the issue of liability
28   of any defendant."  ECF No. 161 at 3 n.3.

1   response lacks foundation, contains hearsay, and is immaterial "except to the extent it supports

2   the conclusion that plaintiff's treatment met the standard of care."  ECF No. 163-2 at 3-4.

3   Defendants' objections are sustained in part; neither plaintiff's personal letter to Kelso nor his

4   resulting urgent mental health evaluation are relevant to the matters at issue.  However, CCHCS'

5   official assessment of plaintiff's medical treatment in September 2012, based on a then-current

6   review of plaintiff's medical records, is relevant in evaluating defendants' treatment decisions.

7   Therefore, defendants' objections are overruled as to the September 26, 2012 CCHCS/CCU

8   response.

9        Finally, defendants object to the admissibility of plaintiff's declaration filed July 8, 2019

10   (ECF No. 149)[5] on the ground it is unverified.  See ECF No. 163-2 at 4.  The Ninth Circuit has

11   held that "when a litigant appears pro se, the court "must consider as evidence in his opposition to

12   summary judgment all of [plaintiff's] contentions offered in motions and pleadings, where such

13   contentions are based on personal knowledge and set forth facts that would be admissible in

14   evidence, and where [plaintiff] attested under penalty of perjury that the contents of the motions

15   or pleadings are true and correct."  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (citing

16   McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir.1987) (verified pleadings admissible to oppose

17   summary judgment)); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir.1998) (verified

18   motions admissible to oppose summary judgment); Schroeder v. McDonald, 55 F.3d 454, 460

19   n.10 (9th Cir.1995) (pleading counts as 'verified' if the drafter states under penalty of perjury that

20   the contents are true and correct).")

21        Application of this rule would normally support defendants' general objection to

22   plaintiff's unverified declaration filed July 8, 2019 (ECF No. 149), as well as his unverified

23   opposition filed the same day, which includes plaintiff's summaries of undisputed and disputed

24   facts (ECF No. 148).  However, by order filed July 15, 2019, this court found several of

25   plaintiff's numerous filings on July 8, 2019 (ECF Nos. 148, 149, 153 and 154) directly responsive

26   to defendants' motions for summary judgment and construed them together as a "consolidated

27

28   [5]  Defendants mistakenly reference this document as ECF No. 147.  See ECF No. 163-2 at 4-14.

opposition thereto." ECF No. 159 at 1.  The other matters filed that day (ECF Nos. 153 & 154) were verified.  In addition, plaintiff's complaint was verified, ECF No. 38, as was plaintiff's reply brief filed August 29, 2019, ECF No. 164, and plaintiff attested to the truth of his February 5, 2019 deposition testimony.  The court construes these submissions collectively, and therefore overrules defendants' objection.

The court need not reach defendants' numerous specific objections (ECF No. 163-2 at 4-14) to plaintiff's July 8, 2019 declaration (ECF No. 149) but acknowledges that only those facts based on the affiant's personal knowledge may be considered on summary judgment, <u>Jones</u>, 393 F.3d at 923.

**IV.    Facts**

The court has reviewed the parties' proffered undisputed and disputed facts and identified those relevant to plaintiff's claim that defendants were deliberately indifferent in treating plaintiff's pain symptoms.

**A.    Disputed Facts**

• The parties dispute the accuracy of prison medical records reflecting that plaintiff has a history of diverting prescription medications.

**B.    Undisputed Facts**

For purposes of summary judgment, the following facts are undisputed by the parties or as determined by the court upon review of the record.  These facts include the medical assessments made by defendants and other medical providers.

• Plaintiff Bryan Mazza, born in 1966, is a prison inmate incarcerated at CSP-SOL. Plaintiff is serving a 25-year-to-life sentence under California's three-strikes law following a 2006 conviction for, inter alia, possession of a controlled substance (methamphetamine).  Df. Req. for Judicial Notice, Ex. A (ECF No. 145 at 7-16).

• Plaintiff experiences chronic pain due to bone, joint and nerve damage caused by past injuries and ongoing degenerative processes.  Objective imaging shows that plaintiff has degenerative joint disease in his hips and knees; degenerative disc disease in his neck; arthritis in both shoulders and elbows and in his left forearm; right cervical neuropathy; and a healed gunshot

11

1    wound fracture to his right femur repaired with extensive fixation hardware.[6]

2         • Plaintiff has pursued a lifelong commitment to physical fitness and has endeavored to

3    continue pursuing vigorous exercise while incarcerated.  Pl. Decl., ECF No. 149 at 1-6; see also

4    July 30, 2015 video submitted by defendants.

5         • From 2006 to 2010, plaintiff was incarcerated at the Martinez Detention Facility where

6    he received medical care through the Contra Costa Regional Health Care Center.  Compl., ECF

7    No. 38 at 4; id. at 11-27.  In August 2007, plaintiff was prescribed Vicodin and morphine in the

8    form of MS Contin to treat his chronic pain; plaintiff requested that his MS Contin be

9    discontinued and replaced with Ultram (tramadol), which was granted.  Id. at 15-6.  In January

10   2008, plaintiff was prescribed tramadol and methadone for pain.  Id. at 18.

11        • From 2010 to 2011, plaintiff was incarcerated at San Quentin State Prison.  On March 3,

12   2010, LVN Gullem documented the report of a correctional officer that plaintiff had diverted his

13   Methadone (March 3, 2010 Medical Management Referral).  ECF No. 144-4 at 39 (Dfs. Ex. B);

14   ECF No. 146 (Dfs. Ex. E to Plaintiff's Deposition).  The Referral contains a handwritten notation

15   on the top that reads: "Caught I/M attempting to hide methadone.  The escorting CO said that I/M

16   Mazza has been caught multiple times."  The LVN checked the form's standard option,

17   "Exhibiting a pattern of non-compliance with the procedure for taking Nurse Administered or

18   D.O.T. medications.  If an inmate is suspected of cheeking/hoarding, etc. he is referred to the Unit

19   Sgt. as well as the provider."  The word "cheeking" (concealing medication in one's mouth to

20   avoid swallowing it) is circled.

21   ////

22

23   _____

     [6]  These imaging results are included as exhibits to plaintiff's complaint.  See ECF No. 38 at 14,
24   29-34, 36, 38-9, 43, 45, 47, 49, 59-61, 63-4, 67-9, 72, 119.  Although this evidence is not
     authenticated, it is admissible for summary judgment purposes because it "could be presented in
25   an admissible form at trial."  Fraser v. Goodale, 342 F.3d 1032, 1037 (9th Cir. 2003) (citation
     omitted), cert. denied sub nom. U.S. Bancorp v. Fraser, 541 U.S. 937 (2004).  Moreover, the
26   findings of these imaging tests are reflected in the treatment notes submitted by defendants.  See
     ECF No. 144-4 at 64, 68, 72.  Plaintiff explains that he had surgeries on his right shoulder and
27   elbow in 1998 due to arthritis and bursitis; hip reconstruction and femur reduction surgery in
     1995 after being shot; and that he sustained a fractured left elbow and "extruding C6 and C7
28   vertebrae" after being attacked by other prisoners in 2010.  Pl. Decl., ECF No. 149 at 2.

• On August 12, 2010, Dr. Jenny Espinza-Marcus examined plaintiff as a chronic care patient. ECF No. 144-4 at 37-8 (Dfs. Ex. B). Plaintiff was then regularly prescribed methadone, gabapentin and naprosyn to treat his pain symptoms. He was recently prescribed a temporary five-day increase in methadone by the Triage and Treatment Area (TTA), following a fall. Dr. Espinza-Marcus declined plaintiff's request to maintain the increased dose of methadone, but added tylenol to his medication regime, noting, id. at 38:

> At this point it is not appropriate to increase methadone since we have not maximized other nonnarcotic pain medication modalities. Also, his imaging does not support at this time an increase in narcotics. As a matter of fact, it does not at this time support that he is on narcotics at all so this may need to be reassessed in the future.

Dr. Espinza-Marcus ordered a lower back x-ray, again referred plaintiff to physical therapy, and recommended that plaintiff be seen by "our other PCP provider next visit for another opinion since plaintiff is very dissatisfied with the care he is getting from me and threatening lawsuit, etc." Id.

• On August 29, 2010, plaintiff sent a note to Dr. Espinza-Marcus on a Health Care Services Request Form that provided the following, ECF No. 144-4 at 36 (Dfs. Ex. B):

> Dr. Espinoza, I admit I haven't been taking my gabapentin. It makes me feel ill and doesn't help. I didn't want to tell you because I thought you['d] think I was "shopping" for drugs. I have to be honest. The methadone as a medication is effective. Could I please have that prescription renewed. Or see me. I apologize for not communicating.

• On August 31, 2010, San Quentin physician Dr. Jenny Espinoza-Marcus completed an August 31, 2010 Chart Note for the express purpose of documenting that plaintiff's "gabapentin and methadone were both stopped because of cheeking." See ECF No. 144-4 at 35 (Dfs. Ex. B). The Note provides in pertinent part, id.:

> This is to document that the patient's gabapentin and methadone were both stopped because of cheeking. His toxicology showed undetectable levels of gabapentin and methadone. The patient saw the RN complaining about this [and suggested that his blood test was confused with that of another inmate] . . . In any case, per policy gabapentin and methadone were discontinued, as he was not taking it, per the toxicology results. They should not be continued, as per policy.

13

• Medical notes from the TTA on September 3, 2010, where plaintiff was treated for gastroenteritis symptoms, state in pertinent part: "12 gabapentin caps were found in Pt. cell.  Pt. states he was cheeking them."  ECF No. 144-4 at 35 (Dfs. Ex. B); see also id. at 33.

• On September 10, 2010, Dr. Espinoza-Marcus again saw plaintiff, noted that his urine toxicology showed he was cheeking both gabapentin and methadone, and explained that "[p]er policy, his medications were appropriately discontinued and it is not appropriate to restart opiates or controlled/restricted medications," including tramadol, which plaintiff requested.  ECF No. 144-4 at 31-2 (Dfs. Ex. B).  Dr. Espinoza-Marcus prescribed omeprazole to help plaintiff's stomach better tolerate naprosyn and prescribed a tricyclic antidepressant to treat his neuropathic pain; she noted that plaintiff continued to have capsaicin balm, had seen physical therapy, received a wedge pillow for his legs, and could obtain a TENS (transcutaneous electrical nerve stimulation) unit after his release from Administrative Segregation (Ad Seg).  Id. at 32.

• On November 15, 2010, Dr. Espinoza-Marcus examined plaintiff "for a focused visit for followup from [TTA] in which he was either in a fight or assaulted and sustained rib fractures and small laceration on scalp" for which he was treated at Marin General Hospital.  ECF No. 144-4 at 28 (Dfs. Ex. B).  TTA prescribed plaintiff a short-term dose of morphine which Dr. Espinoza-Marcus thought was reasonable to continue; she also changed his prescription for naprosyn to indomethacin and refilled his prescription for tylenol.

• On November 29, 2010, plaintiff again saw Dr. Espinoza-Marcus.  ECF No. 144-4 at 29-30 (Dfs. Ex. B).  Plaintiff complained that his short-term dose of morphine (MS Contin) had ended, that he continued to have rib pain and was coughing up foam.  Plaintiff stated that he was not taking the ibuprofen (naprosyn) or omeprazole due to his "thin stomach lining," was not taking the tylenol, and was taking indomethacin only once rather than three times a day.  Id. at 30.  Dr. Espinoza-Marcus ordered a chest x-ray and prescribed a short-term dose of Tylenol with Codeine.  Dr. Espinoza-Marcus also prescribed Vitamin D, explaining that his deficit "might be contributing to his chronic pain."  Id.

• On March 17, 2011, Dr. Espinoza-Marcus referred plaintiff to "PM&R" (Physical Medicine and Rehabilitation) for assessment of his "chronic total body pain" in light of his

14

history of "med. seeking" and "cheeking/diverting gabapentin & methadone."  ECF No. 144-4 at 27 (Dfs. Ex. B).

     • In April 2011, plaintiff was transferred to CSP-SOL.

     • In May 2011, defendant Dr. J. Lipson was assigned as plaintiff's primary care physician (PCP).  Dr. Lipson was a CDCR Physician and Surgeon, board certified in Family Medicine and licensed by the Drug Enforcement Administration's (DEA) Drug Diversion Division.  Lipson Decl. ¶ 2 (ECF No. 144-4 at 142).

     • At plaintiff's initial appointment on May 18, 2011, Dr. Lipson noted that plaintiff had "good musculature throughout" but experienced "[c]hronic pain, including multiple sites of osteoarthritis."  ECF No. 144-4 at 72-3 (Df. Ex. C).  Although plaintiff denied that he had cheeked his pain medications, Dr. Lipson explained that he was bound to regard the documented information as accurate and could not re-prescribe restricted medications.  Id.  Dr. Lipson continued plaintiff's prescriptions for tylenol and indomethacin to treat his pain, ordered a wedge pillow and knee braces to help reduce his joint stress, and completed referrals for an orthopedic evaluation and an outside chronic-pain management specialist.  Id. at 71, 73.  The referral to an outside chronic-pain management specialist was later "denied consistent with InterQual, a clinical-decision support tool that applies objective outcome-related treatment standards."  Lipson Decl. ¶ 8 (ECF No. 144-4 at 143).  The referral to orthopedics was also denied on the ground that plaintiff did not require a hip replacement.  ECF No. 144-4 at 68 (Df. Ex. C).

     • In June 2011, plaintiff reported improvement in his leg pain.  Dr. Lipson continued plaintiff's pain medications and authorized a TENS unit.  Dr. Lipson completed referrals for "an MRI, to assess whether knee surgery might be appropriate, . . . physical therapy for his knee & hip to help minimize the progression of his arthritis and alleviate pain, and . . . a hip injection to treat his complaint of pain."  Lipson Decl. ¶ 9 (ECF No. 144-4 at 143); ECF No. 144-4 at 68-70 (Df. Ex. C).

     • In July 2011, plaintiff's MRI and hip injections were still pending.  Plaintiff was not tolerating the indomethacin so Dr. Lipson prescribed etodolac (another NSAID) and referred plaintiff for kenalog injections to treat his hip pain.  Plaintiff told Dr. Lipson that his pain was

severe, that he was tempted to "buy medications on the black market" and hoped his ineligibility for narcotics could be reconsidered.  Plaintiff again challenged his negative urinalsysis tests and stated that he had previously diverted medications because he could not tolerate it on an empty stomach and would take it later with meals.  Lipson Decl. ¶ 10 (ECF No. 144-4 at 144); ECF No. 144-4 at 65-7 (Df. Ex. C).

• In September 2011, plaintiff complained of significant right shoulder pain with numbness down his right arm into his hand and fingers.  Plaintiff reported that he was "still working out, but says he needs to do that because it makes him feel much better overall, but he is hurting lying down.  He has numerous areas of pain."  ECF No. 144-4 at 64.  Dr. Lipson noted that plaintiff's "muscular physique indicated that he still was participating in intense workouts at a level that exacerbated his conditions and contributed to his pain.  To address his reports of chronic pain I continued his pain medications and referred him for an x-ray of his shoulder, c-spine, and elbow, and referred him for an EMG of his neck."  Lipson Decl. ¶ 11 (ECF No. 144-4 at 144); ECF No. 144-4 at 64 (Df. Ex. C).

• On October 12, 2011, in response to Dr. Lipson's referral, neurologist Dr. Albert Mitchell (not a defendant) conducted an EMG of plaintiff's right upper extremity, which was "suggestive of chronic R C6 radiculopathy."  Compl., ECF No. 38 at 63.  Also in October 2011, plaintiff received bilateral hip injections, which he found unhelpful; he also obtained orthotics. ECF No. 144-4 at 62 (Df. Ex. C).

• In December 2011, plaintiff stated that physical therapy was helpful but he was still experiencing extreme pain in his left hip that impaired his walking.  Plaintiff expressed fear that he would not be able to run again and frustration "that dealing with one joint at a time feels inadequate and too slow and incomplete . . . that perhaps because of his history of working out and appearing to be in overall good shape that his pain is not being taken seriously[.]"  ECF No. 144-4 at 62 (Df. Ex. C).  Plaintiff told Dr. Lipson that, as his PCP, he should be advocating for plaintiff to restart more effective narcotic medications.  Id.  Dr. Lipson continued plaintiff's etodolac pain medication, referred him for an MRI of both hips, and noted that plaintiff was scheduled for an MRI of his neck as a follow up on the positive EMG results.  Dr. Lipson did not

16

1    refill plaintiff's prescription for tylenol, which had expired, because plaintiff had not been

2    requesting it.  Dr. Lipson noted that plaintiff was unwilling to try adjuvant psychiatric

3    medications that could provide pain relief or any psychiatric medications to treat his bipolar

4    disorder.  Dr. Lipson ordered numerous laboratory tests to assess whether there were systemic

5    reasons for plaintiff's pain and fatigue and referred plaintiff to the High Risk Clinic for further

6    workup.  Lipson Decl. ¶ 13 (ECF No. 144-4 at 144-45); ECF No. 144-4 at 62-3 (Df. Ex. C).

7        • In January 2012, Dr. Lipson continued plaintiff's medications, prescribed non-narcotic

8    injections to treat plaintiff's left arm and wrist pain, and ordered a brace for plaintiff's left wrist.

9    Plaintiff's lab tests were normal.  Dr. Lipson made two specialty referrals, one to Dr. McAlpine in

10   the Rheumatology Clinic, and another to Neurology.  See Lipson Decl. ¶¶ 14-5 (ECF No. 144-4

11   at 145); ECF No. 144-4 at 58-61 (Df. Ex. C)

12       • On January 17, 2012, plaintiff had a consultation with CSP-SOL rheumatologist Dr.

13   McAlpine (not a defendant), who was also CSP-SOL Chief Physician and Surgeon.  Based on

14   plaintiff's medical record, statements and examination, Dr. McAlpine referred plaintiff for

15   consultation with neurologist Dr. Mitchell for consideration of epidural steroid injections and/or

16   surgery, and for an orthopedic evaluation of plaintiff's right shoulder for possible consideration

17   by the Surgical Committee; prescribed Cymbalta (duloxetine) (30 mg BID), an antidepressant;

18   made a note to present plaintiff's care to the Pain Committee; and set a follow-up appointment in

19   30 days.  See Compl., ECF No. 38 at 50-55 (Pl. Ex. 10).

20       • On January 24, 2012, in response to Dr. Lipson's referral, defendant Dr. J. McCue met

21   with plaintiff for his high-risk evaluation.  Dr. McCue, who is board certified in internal and

22   geriatric medicine, was then CSP-SOL Chief Medical Executive (CME).  As recounted by Dr.

23   McCue:

24           On January 24, 2012, I reviewed Mazza's complaints of chronic pain
             and depression, and the treatment he was receiving.  Based on my
25           medical experience and expertise, as well as a review of records
             relating to Mazza's treatment at Solano, the treatment Dr. Lipson was
26           providing for Mazza's complaints of chronic pain was medically
             appropriate and exceeded community standards of care.  Morphine
27           was not medically indicated for Mazza's complaints of chronic pain.
             Mazza's medical records documented his prior diversion of
28           prescription medications, which demonstrated that he could not be

                                               17

> trusted to take medications as prescribed, or to safely use morphine to manage his pain.  I encouraged Mazza to try Cymbalta, an antidepressant that I believed could both effectively treat Mazza's depression and might help alleviate his chronic pain.  I discussed this course of treatment with Dr. McAlpine, who agreed to follow up concerning Mazza's care.  I also noted that Mazza's case was scheduled for consideration by the institution's pain-management committee.

McCue Decl. ¶ 8 (ECF No. 144-4 at 138); see also ECF No. 144-4 at 76-7 (Df. Ex. D).

• Dr. McCue "also sat on an interdisciplinary committee and pain-management committee that discussed the preferred course of treatment to manage Mazza's complaints of chronic pain in light of his known medical history."  McCue Decl. ¶ 9 (ECF No. 144-4 at 138).  Although he did not direct plaintiff's care, Dr. McCue avers that he "agreed with the course of treatment advised by Mazza's treating physician."  Id.  Dr. McCue left CSP-SOL in September 2012.  Id. ¶ 1.

• In early February 2012, rheumatologist Dr. McAlpine recommended tramadol (a synthetic opioid) to treat plaintiff's neck pain.  Compl., ECF No. 38 at 56.  Dr. Lipson, plaintiff's treating physician, agreed with this recommendation and prescribed it.[7]  Lipson Decl. ¶ 16 (ECF No. 144-4 at 145).

• Later in February 2012, Dr. Lipson changed plaintiff's etodolac prescription to Celebrex (another NSAID) at plaintiff's request, increased his tramadol dose, and renewed plaintiff's tylenol and Cymbalta.  Lipson Decl. ¶ 17 (ECF No. 144-4 at 145); ECF No. 144-4 at 56-7 (Df. Ex. C)  Dr. Lipson observed in pertinent part, ECF No. 144-4 at 57:

> The patient is at high risk of abuse, even acknowledging that he has an addictive personality and he is concerned that by not getting prescribed narcotics he may be forced to do things that would become addictive [referencing plaintiff's subjective complaints], but at this point he has been discussed by the Pain Committee 3 times

_____

[7] Dr. Lipson notes that, "at that time, [Tramadol] was widely regarded as a safer treatment for pain because the Federal Drug Administration (FDA) indicated that it did not pose a high risk of dependency or abuse and the Drug Enforcement Agency (DEA) did not classify Tramadol as a controlled substance."  Lipson Decl. ¶ 17 (ECF No. 144-4 at 145).  Tramadol was reclassified by the U.S. Drug Enforcement Agency, effective August 18, 2014, as a Schedule IV controlled substance.  See Federal Register, Vol. 79, No. 127, pp. 37623-30] (July 2, 2014).  This change was reflected in the California Correctional Health Care Services protocol.  See CCHCS Care Guide: Pain Management Part 3-Opioid Therapy.

18

> within the last several months, and narcotics are not indicated given the extreme high risk of abuse and diversion and Federal guidelines and CDCR guidelines as well as the fact that at his young age with numerous sites of osteoarthritis and internal derangement and his continued working out, narcotics would ultimately be of questionable benefit for the long term regardless.   Will prescribe celecoxib, increase his tramadol and start Tylenol for him to take at the same time as tramadol.

• In March 2012, neurologist Dr. Mitchell prescribed morphine to treat plaintiff's chronic neck pain.  Dr. Mitchell did not confer with Dr. Lipson, plaintiff's treating physician.  Lipson Decl. ¶ 18 (ECF No. 144-4 at 145); ECF No. 144-4 at 80 (Df. Ex. E).

• On April 3, 2012, plaintiff was again seen by Dr. McAlpine who, in pertinent part, noted his deferral to Dr. Mitchell's assessment regarding plaintiff's morphine prescription. Compl., ECF No. 38 at 57-8.

• Plaintiff again saw Dr. Lipson on April 24, 2012, for complaints of increased back pain and as a follow up to plaintiff's TTA treatment for back spasms on April 29-20.  Dr. Lipson prescribed robaxin/methocarbamol to treat plaintiff's spasms but observed, based on various sources, that plaintiff appeared to be exaggerating his complaints of pain.  Dr. Lipson declined to prescribed Tramadol and morphine simultaneously, and informed plaintiff that he would not "prescribe morphine unless the prescription from the neurologist expired, in which case [he] would prescribe it only to taper Mazza off of it, to avoid withdrawal."  Because the morphine prescription written by the neurologist was scheduled to expire on May 5, 2012, Dr. Lipson wrote an order on April 30, 2012 to start tapering plaintiff off morphine beginning May 6, 2012. Lipson Decl. ¶ 19 (ECF No. 144-4 at 145-46); ECF No. 144-4 at 54-5 (Df. Ex. C).

• Also, on April 30, 2012, Dr. McAlpine responded as follows to an inquiry from plaintiff, Compl., ECF No. 38 at 84:

> Dr. Mitchell can continue your pain meds.  If Dr. Lipson had written them then the Pain Committee of Solano would be in charge.

• Dr. Lipson recounts plaintiff's May 7, 2012 appointment as follows, Lipson Decl. ¶ 20 (ECF No. 144-4 at 146):

////

19

At Mazza's appointment the next day, on May 7, 2012, I found him to be severely emotionally distressed because the morphine was being discontinued. I did not observe any objective signs of withdrawal or decreased function. I again explained that other medicines were preferred methods of treatment for chronic pain and lifelong narcotics are not medically indicated. He became angry and aggressive, to the extent where another physician called custody staff. The appointment was terminated because it was no longer productive. I initially wrote the taper order but later opted to hold the taper until a multi-disciplinary meeting could take place in consideration of the complexity in treating this patient with addictive behavior and competing medical concerns. I restored Mazza's prior dose of morphine.

Accord ECF No. 144-4 at 52-3 (Df. Ex. C); ECF No. 144-4 at 84, 87 (Df. Exs. F, G). Dr. Lipson noted that the neurologist prescribing morphine (Dr. Mitchell) stated he would defer to the Pain Committee. ECF No. 144-4 at 52 (Df. Ex. C).

• On May 10, 2012, plaintiff again saw Dr. Mitchell, who continued his prescription for morphine. Compl., ECF No. 38 at 64; ECF No. 144-4 at 93 (Df. Ex. H).

• On May 16, 2012, an interdisciplinary meeting was convened at CSP-SOL to evaluate plaintiff's care. Those attending were Dr. Lipson, plaintiff's primary care physician; CSP-SOL CME Dr. McCue; Dr. McAlpine, Rheumatologist and CSP-SOL Chief Physician and Surgeon; Dr. Cynthia Mitchell representing Mental Health; Dr, Kelly, plaintiff's psychologist; and two clinical counselors (Hughes and Baker) from plaintiff's housing unit. See ECF No. 144-4 at 51 (Df. Ex. C). The findings of the group were recounted by Dr. Lipson in plaintiff's May 17, 2012 Chart Note, as follows, id.:

The issues discussed were the patient's chronic pain, his mental health issues, and his substance abuse history and possibly active use and the best clinical management for the patient in light of all these issues. The issues discussed were his chronic pain due to numerous musculoskeletal injuries and history of trauma, his noncompliance with recommendations and appropriate exercise recommendations, the variability and inconsistency between observed behavior/ movements/activity and his complaint of symptoms as witnessed and documented by staff in the [TTA], as well as his primary care physician and staff in the yard who have seen him; also discussed was his occasional lability in his mood and abnormally/bizarre seemingly elevated mood and altered behavior/affect/personality; his apparent lack of insight, manifested as unwillingness to accept responsibility for prior substance use and misuse and diversion of narcotics and other substances, his hostile behavior towards his primary care physician regarding narcotics and the risks and benefits of continuing him on narcotics, and his pattern of seeking pain

20

medications from different providers, including specialty provider who prescribed him morphine but then declined to further prescribe it, deferring to the pain committee who has addressed his pain issue on at least 6 different occasions and assessed that the risk to narcotics outweighs the benefits. The information from the clinical counselors included prior history of cocaine, methamphetamine, and alcohol abuse and positive methamphetamine tests while in [CDCR] custody. On review of the patient's total medical record, the overwhelming recommendation and conclusion from the medical and mental health staff on the interdisciplinary committee is to continue the weaning of his morphine. A 128-C3 is being submitted regarding the patient's inappropriate and potentially hostile and aggressive behavior towards his primary care physician at the last visit which necessitated his removal under the orders of the custody officer because he would not leave at the direction of his primary care physician. The patient will continue to be evaluated by his mental health provider, as well as by his primary care physician, if necessary with Custody present due to his previously hostile and potentially threatening behavior.

• Dr. Lipson further explained in his declaration that he "was informed by the clinical counselors that Mazza had a history of cocaine, methamphetamine, and alcohol abuse, and positive methamphetamine tests while in CDCR custody. After reviewing Mazza's case factors, total medical record, the overwhelming recommendation and conclusion from both medical and mental health staff on the committee was to proceed with tapering and terminating the morphine prescription. I initiated the morphine taper." Lipson Decl. ¶ 21 (ECF No. 144-4 at 146-47) (citing Df. Ex. C at 5/17/12 Chart Note [ECF No. 144-4 at 51], and Df. Ex. G at 5/17/12 Medication Reconciliation [ECF No. 144-4 at 88]). Dr. Lipson continued plaintiff's regular prescriptions for, inter alia, tramadol, tylenol, naprosyn, and Cymbalta. Df. Ex. G at 5/17/12 Medication Reconciliation [ECF No. 144-4 at 88]).

• On June 21, 2012, a month after the interdisciplinary meeting, Dr. Mitchell again prescribed morphine to plaintiff. Lipson Decl. ¶ 22 (ECF No. 144-4 at 147) (citing Df. Ex. G at 6/20/12 and 6/25/12 Medication Reconciliations [ECF No. 144-4 at 88-9]).

• Dr. Lipson saw plaintiff twice in August 2012, who complained of headaches due to cervical radiculopathy and increased hip pain, and was awaiting epidural injections prescribed by Dr. Mitchell. As summarized by Dr. Lipson, Lipson Decl. ¶ 23 (ECF No. 144-4 at 147):

In August 2012, I examined Mazza for follow up on his complaints of pain. I granted Mazza's request to change his naproxen to etodolac, increased his tramadol to 400 mg (the maximum adult

dose) and directed a follow-up appointment.  I also discussed with Mazza the need to balance his exercise with his body's limitations. Mazza saw an outside orthopedic specialist, had epidural steroid injections pending, and continued to receive the morphine prescribed by neurology.  I directed Mazza's return to the clinic for follow-up. I referred Mazza for specialty services for chronic pain management, an orthopedic consult, and a bone scan. The neurologist continued to prescribe morphine, and I did not interfere with this prescription.

Accord, Aug. 17, 2012 Medical Progress Note, ECF No. 144-4 at 49-50 (Df. Ex. C) ("Neurology recently increased his morphine and they will continue to be the prescriber for that, if the neurologist feels that it continues to be indicated.").

• Defendant L. Austin was CSP-SOL Chief Executive Officer (CEO) of Health Care Services at CSP-SOL from 2009 until September 2017.  Austin Decl. ¶ 1 (ECF No. 144-4 at 154). On August 28, 2012, defendant Austin issued a Second Level Response to plaintiff's appeal Log No. SOL HC 12036635.  Compl., ECF No. 38 at 99, 101-02.[8]  The appeal was multifaceted in that plaintiff requested that he be prescribed morphine and referred to neurologist Dr. Mitchell; stated that he disagreed with Dr. Lipson's medical decisions and requested that he be assigned another PCP; requested that he obtain new testing for substance abuse, that he be permitted to conduct an Olson review of his medical records,[9] and that be permitted to speak with a mental health representative.  Defendant Austin noted that, on First Level Review, plaintiff was evaluated by Dr. McAlpine who presented plaintiff's case to the Pain Management Committee, which denied plaintiff's request for morphine.  Austin noted that Dr. McCue had evaluated plaintiff's medical needs on Second Level Review and that plaintiff saw Dr. Mitchell on June 21, 2012 and August 2, 2012, who prescribed morphine to plaintiff on August 2, 2012.  Defendant Austin stated that prison policies precluded assigning plaintiff another PCP.  Plaintiff's appeal was partially granted on the following grounds, ECF No. 38 at 102:

---

[8]  Page 100 reflects a portion of the Director's Level Decision on this appeal.  Although this portion is incomplete and undated, it appears the appeal was denied at this level on the ground that plaintiff was "receiving treatment deemed medically necessary."  Compl., ECF No. 38 at 100.
[9]  An Olson review refers to the right of California inmates to inspect and copy non-confidential records maintained in their central and medical files, as established by In re Olson (1974) 37 Cal. App. 3d 783.

22

[Y]our appeal is partially granted, in that you were prescribed the medication Morphine on August 2, 2012.  You have been seen by Dr. Mitchell, onsite Neurologist, who recommended cervical epidural injections and a referral to see the Pain Management Specialist, which is pending approval.  You are being seen and treated by Dr. McAlpine, Board Certified Rheumatologist for your chronic pain issues.  You are also being seen and provided treatment by Solano Mental Health Department.  You were seen by the Medical Records Department for copies in July 2012.

• Defendant Austin avers that she is not a physician and "was not authorized to treat inmates or direct an inmate's specific course of medical care."  Austin Decl. ¶ 2 (ECF No. 144-4 at 154-55).  Rather, as CEO, Austin's responsibilities included "administrative oversight over the appeals process," which involved "reviewing and signing off on the responses to inmate health-care appeals" to "ensur[e] that the proper steps were followed," specifically, "whether the appeal was assigned to a proper person for review, a review had been conducted, the response addressed each issue raised, and the applicable time frames had been met."  Austin Decl. ¶¶ 2-4 (ECF No. 144-4 at 155).

• When Dr. Lipson saw plaintiff on August 31, 2012, he noted that plaintiff had a specialty appointment with an outside orthopedist the week before and was awaiting an MRI.  Dr. Lipson noted that Dr. Mitchell extended plaintiff's morphine prescription for ninety days, and that Dr. McAlpine hand carried the prescription to the pharmacy because Dr. Mitchell was not on-site.  ECF No. 144-4 at 47-8 (Df. Ex. C).

• At this juncture, on September 26, 2012, CCHCS's Controlled Correspondence Unit (CCU) issued a response to plaintiff following a CCHCS inquiry into the letter plaintiff sent to the Federal Receiver.  The response found in pertinent part that plaintiff was receiving "five prescriptions for pain medication" and "medical staff is providing medically necessary treatment for [his] current health care needs."  See Compl., ECF No. 38 at 141-3; and Opposition Memorandum, ECF No. 154 at 165-78.

• Dr. Lipson next saw plaintiff on October 19, 2012, and recounts, Lipson Decl. ¶ 24 (ECF No. 144-4 at 147):

In October 2012, Mazza declined an elbow sleeve to alleviate pain and provide support because he did not want to pay for it. I offered him an ace wrap instead. Mazza continued to receive the morphine

23

prescribed by neurology. I continued his treatment with duloxetine, etodolac, tylenol, and tramadol. I also ordered x-rays of his left elbow, referred him for orthotics, and referred him for a knee injection to treat his pain. The neurologist continued to prescribe morphine, and I did not interfere with this prescription.

Accord, Oct. 19, 2012 Medical Progress Note, ECF No. 144-4 at 44-7 (Df. Ex. C):

Cervical radiculopathy. Being managed by Neurology. He has completed 2 epidural steroid injections. He said both times he had about 2 days of pain relief and then it [re]occurred. He is going to have a third. At this point, there is no indication to refer him or prepare him for neurosurgery as there is still hope that the third injection will help, and at that point, if the patient is still in significant pain, may consider referral to Neurology versus Neurosurgery. Of note, Neurology is the physician prescribing the patient's morphine. This is not being done by myself. It has been renewed by the Chief Physician and Surgery [Dr. McAlpine] because the neurologist is not on site during medication renewals to do that. He is also on duloxetine, etodolac, Tylenol and tramadol.

• Dr. Lipson's last record appointment with plaintiff was on November 19, 2012, following a recent epidural injection and pain consult. Dr. Lipson made the following notes regarding plaintiff's pain medications, ECF No. 144-4 at 42-3 (Df. Ex. C) (Nov. 19, 2012 Medical Progress Note):

The patient says he is still in pain. He again spent several minutes reviewing the history at San Quentin of his drug screen that he feels was erroneous, and I explained to him that that cannot be continually revisited by us. His main concern today that he articulated is that it stays in the healthcare record and would predispose any future physicians to regard him suspiciously, to not trust his medical conditions or to think that his medical needs or requests are legitimate. In addition, he reviewed with me my note regarding the Interdisciplinary Committee several months ago that also included clinical counselors, at which time I had been informed that he had had a positive methamphetamine screen that was in his C-File, and he feels that this is erroneous. I explained to him that I would take note of that, that I would document that in this progress note, and I related to him that I was reporting what I had been told, but that I would certainly also make note that he feels that that is incorrect, and so I am putting that in this note as well.

. . . . Cervical radiculopathy and chronic pain. He is on morphine. He is on duloxetine, etodolac, Tylenol, and tramadol. The recommendation from the pain specialist was to discontinue the morphine and start methadone 10 mg t.i.d. I discussed this via e-mail with the Chief Physician and Surgeon [Dr. McAlpine], who is aware of this, and it will need to be addressed by the Pain Committee. At this point, the patient's pain is being managed by Neurology. The Chief Physician and Surgeon (CP and S) has

> renewed his narcotics in the past in lieu of the neurologist who was not on site to renew his medications, and this will continue to be the plan. In addition, the patient states that he was told by the pain specialist that he needs a 4th epidural steroid injection.
>
> …. We [] discussed his medical records and his concerns for the discrepancy with those, and that I would place in the note his articulation that he disagrees with what was reported to me regarding having a positive methamphetamine test in his C-File, as well as feeling that the documenting of diversion and drug testing at San Quentin that necessitated the stopping of his narcotics is incorrect.

• Dr. Lipson left employment at CSP-SOL in January 2013. Lipson Decl. ¶ 1 (ECF No. 144-4 at 141.

• On January 8, 2013, Dr. A. Parmar conducted a telemedicine appointment with plaintiff, renewed his prescription for morphine and suggested that oxycontin may be more effective. Compl., ECF No. 38 at 66.

• A January 15, 2013 psychological evaluation is attached to plaintiff's complaint as Exhibit 26. Conducted by Dr. M. Smith, Ph.D., a clinical psychologist with CSP-SOL's Ad Seg Unit, the report states in pertinent part "[m]ethamphetamine addiction has impacted all areas of his life, family, employment, relationships, etc." Compl., ECF No. 38 at 148.

• On March 19, 2013, plaintiff had his first contact with defendant Dr. R. Tan, CSP-SOL Physician and Surgeon. Dr. Tan interviewed and examined plaintiff on the First Level Review of his administrative appeal Log No. SOL HC 13037465, the only appeal plaintiff exhausted before filing the instant action. Compl., ECF No. 38 at 91-3; see also Tan Decl. ¶¶ 3-6, ECF No. 143-5 at 2-3. Dr. Tan's First Level Response (written in the third person), issued April 16, 2013, partially granted plaintiff's appeal and provided in pertinent part, Compl., ECF No. 38 at 91-2:

> You are requesting a neurosurgery referral for your chronic neck pain. You state due to your neck pain you have numbness in your right arm and hand. Records show you were seen by Dr. Parmar in the Telemedicine Clinic on January 8, 2013, and he suggested Oxycontin Extended Release (MS-ER) to 30 mg three times a day (TIO). You are requesting this increase be done; however you are able to do push-ups and aerobic exercises. Be advised, Oxycontin is not one of the approved medications used to manage chronic pain within the department and per your current Medication Reconciliation Sheet you are being prescribed Tylenol, Cymbalta, Morphine, and Tramadol. At this time Dr. Tan noted you have no distress, your shoulders are strong and well developed, and your extremities/limbs show no weakness at all. The EMG of your

neck from October 2011 showed chronic right C6 radiculopathy. The MRI of your cervical spine showed degenerative disc disease (DDD) in C6-C7 and moderate impingement on left cord. Therefore, based on Dr. Tan's assessment and examination, along with your medical history he determined a neurosurgery referral is not medically indicated at this time. You are fully functional and the MRI findings are not compatible with your complaints and symptoms. However, Dr. Tan will request a follow-up with Dr. Mitchell, onsite Neurologist, and he will refer you back to your Primary Care Provider (PCP) for a 30-day follow-up to discuss further pain management.

• Plaintiff's follow-up with Dr. Mitchell, requested by Dr. Tan, took place on April 4, 2013. Dr. Mitchell requested that plaintiff be referred to a neurosurgeon for evaluation of his cervical radiculopathy. However, the request was denied by the CSP-SOL InterQual/"IUMC" (Institution Utilization Management Committee) on the ground that plaintiff lacked an adequate "NSAIDS trial." Compl., ECF No. 38 at 69.

• On May 29, 2013, CSP-SOL Acting CME Dr. A. Pfile (not a defendant) issued the Second Level Response (written in the third person) to plaintiff's appeal Log No. SOL HC 13037465. Compl., ECF No. 38 at 88-90; see also Tan Decl. ¶ 7, ECF No. 143-5 at 3-4. That decision provides in pertinent part, ECF No. 38 at 89:

In your request for a second level review, Dr. Pfile, Chief Medical Executive-Acting (CME-A), reviewed your medical history, progress notes and any relevant radiographs, lab test results, and/or any outside consultations relating to your appeal issues and noted you were seen by Neurology on April 4, 2013, and referred to Neurosurgery, however you do not meet InterQual criteria for neurosurgery evaluation. Additionally it is extensively documented th[at] you engage in vigorous and frequent exercise, ha[ve]well developed musculature, and displayed no functional limitation at recent physician visits. This is not consistent with your stated limited function. . . . [Y]ou will continue follow up with neurology and with your primary care physician. The aforementioned reveals you have not been subjected to any form of staff misconduct or deliberate indifference and you have received, and continue to receive, appropriate medical treatment.

• Defendant Dr. J. Kuersten has been Chief Medical Executive (CME) at CSP-SOL since July 23, 2013; he became Acting CME April 13, 2013. As CME, Kuersten is required to "oversee the staff physicians and other medical staff to help ensure that community standards of care are met, monitor and address quality management and utilization management issues, review and respond to enquiries from oversight entities, monitor compliance with treatment

26

1    requirements, oversee recruiting and performance of physicians, and respond to certain

2    administrative appeals" but does not generally treat inmates directly.  Kuersten Decl. ¶ 1 (ECF

3    No. 144-4 at 130-31).  Prior to becoming CME, Kuersten was a full-time CDCR Physician and

4    Surgeon.

5            • Although he was not plaintiff's treating physician, Dr. Kuersten became involved with

6    plaintiff's medical care in June 2013, after Dr. Lipson's departure.  Kuersten avers:

> On approximately June 5, 2013, I was notified that Mazza's morphine prescription had expired.  This likely occurred because the prescribing neurologist was not on-site. . . . When responding to the morphine renewal request, I conducted a review of Mazza's Unit Health Record and documented the results in a Medical Management Note on June 5, 2013.
>
> Mazza's unit health record documented his history of degenerative joint disease, polysubstance abuse, and drug diversion.  Reports showed that Mazza had been caught cheeking medications and that he had tested negative for medications he was prescribed to take.  These drug-diversion behaviors indicated that inmate Mazza had a significantly higher risk of adverse outcome if treated with morphine or other potent narcotics.
>
> Additionally, Mazza's excellent functional status and aggressive exercise regimen were well documented in the medical records.  These factors also weighed against treatment with morphine because, from a medical standpoint, Mazza's reported level of functioning was at a high enough level that did not support a medical need for narcotics.
>
> Since I could not tell from the medical record why the neurologist believed that morphine was appropriate, whether he was aware of the red flags for treatment, or whether he engaged in proper decision making, I initially neither knew his treatment decisions to be improper nor credited those decisions over my own.  However, when I contacted the neurologist [Dr. Mitchell] he informed me that he may have felt somewhat pressured by Mazza to prescribe morphine and that he had no objection to its discontinuation, especially if discontinuation was recommended  by the pain committee, which it was.
>
> The doctors in attendance at several pain-management committees and a multi-disciplinary meeting had recommended discontinuation of the prescription.  I supported the primary care team's recommendation to taper Mazza off of morphine.  Based on my medical education and experience, morphine was neither medically indicated nor medically appropriate, and the risks of continued treatment outweighed any potential benefits.  Prescribing the taper, in my opinion, could be done with minimal risk to Mazza. The decision to taper also was consistent with CDCR policies, and both state and federal pain-management guidelines.

27

I met with Mazza the following day, on June 6, 2013, to advise him that a taper would start and the reasons for it. A slow opiate taper was initiated to minimize any withdrawal symptoms, and an urgent mental-health referral was made to ensure that Mazza's needs could be addressed. Given Mazza's documented history of substance abuse and the duration of his treatment with morphine, I was concerned that he might react negatively to the taper, and might experience anxiety or depression. I did not want the taper to cause Mazza undue distress. I wanted him to understand that he could notify staff if he experienced any adverse effects, and a mental-health counselor could coach him along if necessary.

Kuersten Decl. ¶¶ 6-12 (ECF No. 144-4 at 131-32); accord ECF No. 144-4 at 96-7 (Df. Ex. I (6/5/13 Medical Management Note and 6/6/13 Provider Progress Note).

• On June 27, 2013, Dr. Mitchell began the taper of plaintiff's morphine and prescribed the alternative medications of Toradol (an NSAID), and Lyrica (to treat neuropathic pain). ECF No. 144-4 at 100 (Df. Ex. J)

• On July 10, 2013, plaintiff was seen by physician Dr. N. Largoza (not a defendant) who recorded plaintiff's "Chief Complaint" as "I have a 602, and I am requesting to have my morphine restarted." See ECF No. 144-4 at 103-04 (Df. Ex. K) (Medical Progress Note). Plaintiff told Dr. Largoza noted that "morphine . . . worked better than the current Tylenol No. 3 and duloxetine" to treat his medical conditions, which he identified in the following order of importance: "chronic headache, bilateral hip pain, bilateral knee pain, right shoulder pain, left elbow pain [and] spine osteoarthritis." Id. at 103. Plaintiff stated that "morphine gave him a better response which allowed him to exercise with decreased pain." Id. Dr. Largoza advised plaintiff that "physicians can and often do change medications based on current circumstances," but told plaintiff that he would present his case to the Pain Committee. Id. at 103-04.

• On July 16, 2013, Dr. Largoza wrote a note to plaintiff, entered as an Interdisciplinary Progress Note, that provided in pertinent part: "After careful review of your case, the Pain Committee has denied your request. You will stay on your current pain meds." ECF No. 144-4 at 107 (Df. Ex. L).

• On October 10, 2013, the CCHCS Chief (J. Lewis for L.D. Zamora, neither are defendants) issued the Third Level Decision on plaintiff's appeal Log No. SOL HC 13037465, finding that "[n]o changes or modifications are required." Compl., ECF No. 38 at 86-7; see also

28

1   Tan Decl. ¶ 7, ECF No. 143-5 at 3-4.

2       • On December 12, 2013, plaintiff had his only other interaction of record with defendant

3   Dr. Tan, who interviewed and examined plaintiff as part of a Second Level Review of his

4   administrative appeal Log No. SOL HC 13038044.  ECF No. 144-4 at 113 (Df. Ex. N).  On

5   December 17, 2013, in response to plaintiff's request to again be prescribed morphine (MS

6   Contin), Dr. Tan took his case to a CSP-SOL Pain Committee meeting.  Id. at 110, 113 (Df. Exs.

7   M, N).  Dr. Tan and Kuerston were the only defendants at the meeting, which was attended by a

8   total of eleven staff members.  As set forth in Dr. Tan's December 19, 2013 Progress Note, the

9   Committee found as follows, id. at 110:

10              Dr. Tan presents Inmate/patient's request to re-instate MS-ER due to
               severe bilateral hips pain, back pain.  Dr. Tan presents patient's
11             clinical conditions, current treatment (T3 3x/day, & Cymbalta),
               examination findings, co-morbid conditions (Migraine/chronic daily
12             HA, Avascular necrosis of left hip, C spine degenerative ds) and MH
               status (not on any MH med).
13
               PMC discussed, considered all of his medical conditions, current
14             treatment and recommended to continue current pain management
               and denied his request to re-instate the MS d/t previous narcotic
15             abuse history and risk outweigh the benefit of prescribing narcotics.

16       • Due to plaintiff's temporary incarceration at another institution in the fall of 2013, two

17   Second Level responses were prepared addressing plaintiff's Log No. SOL HC 13038044.  Dr.

18   Tan was informed by Dr. Pfile, CSP-SOL Acting CME, that "the institution would use the

19   typewritten appeal response that she had authored on August 19, 2013 because both Dr. Pfile's

20   ultimate decision and mine were the same.  My handwritten response of December 2013 was not

21   used as the official second level response."  Tan Decl. ¶¶ 9-11 (ECF No. 143-5 at 4-5); Compl.,

22   ECF No. 38 at 115-7 (Aug. 19, 2013 Second Level Decision); id. at 138-40 (Mar. 26, 2014 Third

23   Level Decision, denying appeal).

24       • On January 30, 2014, Dr. Mitchell again saw plaintiff and recommended that his

25   prescription for morphine be resumed.  Compl., ECF No. 38 at 130; ECF No. 144-4 at 124 (Df.

26   Ex. Q).  There is no indication in the record that this recommendation was implemented prior to

27   plaintiff commencing this action.

28   ////

1    • On February 20, 2014, CSP-SOL physician Dr. Lori Kohler increased plaintiff's dosage

2    of Cymbalta, and changed his prescription for verapamil to propranolol, in an effort to reduce the

3    frequency of his headaches.  ECF No. 144-4 at 116-17 (Df. Ex. O).

4    • On April 22, 2014, plaintiff had a telemedicine consult, including examination, with Dr.

5    G. Williams, M.D., a Physical Medicine and Rehabilitation Specialist, "regarding [plaintiff's

6    chronic pain symptoms."  ECF No. 144-4 at 120-21 (Df. Ex. P).  Dr. Williams did not

7    recommend any changes in plaintiff's medications and found in pertinent part, id.:

> The patient notes 6 out of 10 pain in the hips and back including neck pain that radiates to the head, bilateral shoulder pain, low back pain, bilateral hip pain, and bilateral knee pain.  The patient states that "since I do not get adequate pain relief, I'm unable to do exercises" referring to exercises for his upper body and lower extremity yet has superior bulk consistent with ongoing strength-based exercise program.  He notes that he last did any type of pushups, crunches, sit-ups, squats, lunges or any strengthening exercises for his core since 6 to 7 months ago.  He notes that he does a small amount of curls for his lower extremities not exceeding more than 10 pounds. He states that pain is preventing him from performing exercises at this time.  He does have superior bulk throughout his whole body consistent with strength based exercise program that is ongoing in a patient who notes that he is also a certified trainer.  His functional history is in direct contrast with his superior bulk.
>
> . . . . The patient's claims that he is unable to perform exercises because pain prevents him from performing exercises is not factually correct as the patient would be unable to sustain the superior musculature if he was not performing these exercises on an ongoing basis.  During today's appointment, stretching exercises for the neck were provided including active range of motion and active assist range of motion exercises with the patient verbalizing understanding of the key concepts and knowing not to perform stretching exercises for the neck fast.  The patient also knows to stop any exercise that is problematic.  [¶]  Again, the patient was commended for maintaining superior bulk and continuing an exercise program allowing him a superior functional status.

23    • From April 2014 through January 2015, plaintiff submitted several "Health Care

24    Services Request Forms" (Form CDC 7362).  ECF No. 154 at 7-19 (Pl. Ex. B).  These forms

25    recount plaintiff's complaints of pain throughout his body, seek further evaluation including an

26    MRI, and request further treatment including a cortisone shot and stronger pain medication

27    consistent with Dr. Mitchell's recommendations.

28    ////

1  • Defendant Dr. Kuersten's second and last direct involvement with plaintiff's care was

2  his Second Level Response to plaintiff's 2015 administrative appeal, Log No. SOL-HC-

3  15040586.[10]  Kuersten recounts (Kuersten Decl. ¶ 13 (ECF No. 144-4 at 133-34)):

> In this role, I provided administrative oversight over the appeals process.  This entailed ensuring that the proper steps were followed: I reviewed the first-level response and checked whether an interview had occurred and whether the response was consistent with the documentation available.  Dr. Mulligan-Pfile had responded to Mazza's grievance at the first-level of review.  She documented that Mazza continued to engage in vigorous and frequent exercise, had well-developed musculature, and displayed no apparent  functional limitations.  Dr. Mulligan-Pfile also noted that Mazza's urine had recently screened positive for methadone, even though he was not being prescribed it at the time.  Dr. Mulligan-Pflle did not conclude that either treatment with morphine or any other additional treatment was medically indicated.  Rather, Dr. Mulligan-Pfile opined that Mazza's pain was appropriately managed under the CCHCS pain management policy.  Because Dr. Mulligan-Pfile's response was supported by the information and documents that I reviewed, the appeal was deemed partially granted.

13  • Defendant Kuersten opines (Kuersten Decl. ¶¶ 3-4 (ECF No. 144-4 at 131)):

> Based on my medical experience and expertise, I am competent to diagnose and treat complaints of chronic pain.  Morphine is a highly addictive narcotic drug that generally is not appropriate for treating chronic, non-cancer pain.  Medical research lacks good evidence for effectiveness or benefits of long-term opioid therapy for chronic non-cancer pain.   Tolerance to opioids develops with repeated administration, which means that a higher dosage will be required to achieve the same effect.  The risks of treating with morphine are well established:   side effects include hyperalgesia (paradoxically increased pain), severe constipation, respiratory depression, generalized itching, fluid retention, and death.  These risks increase with increased dosages. Further, while dependence and addiction may arise in any patient, the risks of abuse, diversion and overdosing, and other adverse outcomes are increased for those patients with histories of mental illness or substance abuse.

22  • As recently as July 30, 2015, plaintiff continued to vigorously exercise.  See July 30,

23  2015 video submitted by defendants.

24  • CSP-SOL inmate Edward Christianson averred, in a declaration signed October 9, 2015,

25  that he has known plaintiff for more than 20 years and has "personally witnessed [plaintiff] come

26  from being a great athlete to being a man that is barely mobile . . . . he seems very depleted from

---

[10]  The record does not include a copy of this administrative appeal, which was submitted after this case was filed.

1    what he used to be physically."  ECF No. 154 at 6.

2        • CSP-SOL inmate Joseph Kaufman averred, in a declaration signed October 9, 2015, that

3    he was plaintiff's cellmate at CSP-SOL "[b]etween 2014 and 2015" and "personally witnessed,

4    on a daily basis," plaintiff's "struggle in dealing with chronic pain," "both psychologically and

5    physically," and has "seem[ed] at times very miserable."  ECF No. 154 at 5.

6        • On May 11, 2017, CSP-SOL physician Dr. Lori Kohler noted the Pain Committee's

7    decision to taper plaintiff's gabapentin and tramadol and not to prescribe opioids.  ECF No. 144-4

8    at 127 (Df. Ex. R).  Plaintiff told Dr. Kohler that if his pain meds were tapered, "he will be forced

9    to get them himself" and will "relapse."  Id.  Dr. Kohler noted in part that plaintiff has "chronic

10   complaint of pain in joints [with] objective findings on imaging but he has been very functional

11   and exercises rigorously on a daily basis[.]"  Id.

12                    **C.     Opinion of Defendants' Medical Expert, Dr. Bruce P. Barnett**

13       In addition to submitting their own declarations and exhibits, defendants Austin, Kuersten,

14   Lipson and McCue have submitted the declaration of their expert, Dr. Bruce P. Barnett, M.D.,

15   J.D., M.B.A.  Dr. Barnett previously worked as a physician and medical executive for CCHCS,

16   including during the period relevant to this action, but there is no indication in the record that Dr.

17   Barnett had any direct responsibility for plaintiff's medical care or review of plaintiff's health

18   care appeals.  See Barnett Decl. ¶¶ 1-2, and Ex. A (curriculum vitae) (ECF No. 144-4 at 5-6, 22-

19   4).

20       Dr. Barnett's expertise includes "treatment of conditions . . . that manifest in the prison

21   population, including arthritis and degenerative joint diseases."  He is "on the editorial board of

22   the Journal of Correctional Health Care, a peer-reviewed journal;" "was a member of the Opioid

23   Workgroup Integrated Health Care and Policy Taskforce, a meeting of professionals sponsored by

24   the California Department of Public Health (CDPH);" and "also was a member of the Committee

25   convened at CCHCS to develop the Pain Management Guidelines first published in 2009."

26   Barnett Decl. ¶ 3 (ECF No. 144-4 at 6).

27   ////

28   ////

Dr. Barnett's opinions in this case are based upon his review of the relevant medical records,[11] pleadings, discovery materials and deposition testimony, as well as his training and experience.  Id. ¶ 6.  Dr. Barnett has addressed the medical care provided by each defendant.  In summary, Dr. Barnett opines that none of the defendants, including defendant Tan, were indifferent to plaintiff's medical needs but instead "followed the standards of care for best practices for prescribing opioids in accord with state and federal guidelines."  Id. ¶ 6 n.1 and ¶ 39 (ECF No. 144-4 at 7, 19) (fn. and citations omitted).  Dr. Barnett explains:

> Medication orders from the Defendants to [taper and] not prescribe morphine to Mazza comported with community standards of care for best practices and were consistent with public policy to reduce the risk of death from opiate overdoses.  Morphine is a highly addictive drug that has been identified as a leading cause of overdose deaths.  Side effects from morphine include paradoxically increased pain (hyperalgesia), severe constipation, respiratory depression, generalized itching, fluid retention and death.  Because of Mazza's physical examinations, documented functional capacity, history of drug abuse, and recent drug diversion Mazza's treating physicians have reasonably determined they should not prescribe morphine to Mazza . . .  Moreover, the use of chronic morphine is disfavored by authoritative medical experts who report that morphine use is often ineffective in relieving chronic non-cancer pain and thus provides insufficient benefits to justify the serious harmful side effects and risk of death from overdose.

Barnett Decl. ¶¶ 33, 36 (ECF No. 144-4 at 16-8) (citing, inter alia, CDC Guidelines for Prescribing Opioids for Chronic Pain – United States 2016).

## VI.   Analysis

### A.   Overview

The record amply supports a finding that plaintiff suffers chronic pain.  "Examples of serious medical needs include . . . 'the existence of chronic and substantial pain.'"  Lopez, 203 F.3d at 1131 (quoting McGuckin, 974 F.2d at 1059-60).  The court finds accordingly that plaintiff's pain constitutes a "serious medical need" that satisfies the first part of the deliberate indifference test.  See Jett, 439 F.3d at 1096.  No defendant asserts otherwise.

---

[11]  As set forth above, the undersigned has undertaken an independent review of the medical records in tandem with the parties' respective declarations.  Dr. Barnett's summary of the medical record, which is not duplicated here, is consistent with the undersigned's assessment.

The parties dispute whether defendants' respective responses to plaintiff's serious medical needs met the second part of the deliberate indifference test, that is, whether defendants' challenged "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to [plaintiff's] serious medical needs." Estelle, 429 U.S. at 106.  A defendant is liable under a deliberate indifference theory if he or she knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 837.  "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.' Farmer, 511 U.S. at 839.  'Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.' McGuckin, 974 F.2d at 1059 (alteration and citation omitted)." Toguchi, 391 F.3d at 1057.  Thus, to effectively oppose defendants' motions, plaintiff must present admissible evidence demonstrating a genuine and material factual dispute whether defendants acted with a "sufficiently culpable state of mind." Wilson, 501 U.S. at 297.

**B.      Deliberate Indifference:  Factual Dispute Common to Claims Against All Defendants**

The parties have devoted substantial briefing to their dispute about whether plaintiff's prison medical records are accurate regarding plaintiff's reported history of substance abuse and diversion of prescription medications.  Plaintiff asserts that these allegations, initially noted at San Quentin, are false and therefore that defendants were deliberately indifferent to plaintiff's serious medical needs when they relied on and perpetuated the allegations to deny plaintiff narcotic pain medication at CSP-SOL.  Defendants contend that they were obliged to consider the findings and assessments of plaintiff's prior medical providers and would have been deliberately indifferent to ignore such documentation.

Plaintiff challenges the accuracy of three medical reports in particular:

(1) The March 3, 2010 Medical Management Referral, completed by San Quentin LVN Gullem, documenting the report of a correctional officer that plaintiff was "attempting to hide methadone [and] . . . has been caught multiple times." ECF No. 144-4 at 39 (Dfs. Ex. B).  At his deposition, plaintiff testified that these statements were "unsubstantiated claims" and that he

34

1    "wasn't cheeking medications."  Pl. Depo. at 13:3-10.

2         (2)  The August 31, 2010 Chart Note completed by San Quentin physician Dr. Jenny

3    Espinoza-Marcus documenting that plaintiff's "gabapentin and methadone were both stopped

4    because of cheeking" based on plaintiff's blood test showing the presence of neither prescription.

5    ECF No. 144-4 at 35 (Dfs. Ex. B).  At his deposition, plaintiff testified that this assessment by Dr.

6    Espinoza-Marcus was "untrue."  Pl. Depo. at 86:16-23.

7         (3)  The May 17, 2012 Chart Note completed by CSP-SOL physician Dr. Lipson,

8    reflecting the findings of an interdisciplinary meeting concerning plaintiff's care held the day

9    before.  Dr. Lipson noted in pertinent part that "[t]he information from the clinical counselors

10   included prior history of cocaine, methamphetamine, and alcohol abuse and positive

11   methamphetamine tests while in [CDCR] custody.  On review of the patient's total medical

12   record, the overwhelming recommendation and conclusion from the medical and mental health

13   staff on the interdisciplinary committee is to continue the weaning of his morphine."  ECF No.

14   144-4 at 51 (Dfs. Ex. B).  At his deposition, plaintiff testified that this Note contains "false

15   statements" and "none of it applies;" "[n]or was I diverting medication of any kind.  I stuck to my

16   prescriptions because I needed them as far as being able to conduct my day-to-day living."  Pl.

17   Depo. at 33:9; 30:19-31:9.  In his complaint, plaintiff describes this Note as "the death knell for

18   his pain relief" because Dr. Lipson shared his opinions with an interdisciplinary team that

19   included defendants Dr. McCue and Dr. McAlpine.  Compl. ¶ 17, ECF No. 38 at 5-6.

20        Other than his own statements, plaintiff has presented no evidence to support a reasonable

21   inference that these and related portions of his medical records are inaccurate.  Evidence of

22   plaintiff's "clean" urinalyses and blood tests while incarcerated at CSP-SOL do not change his

23   test results at San Quentin.  Courts considering similar scenarios have rejected the plaintiffs'

24   challenges for lack of evidence.[12]

---

25   [12]  See e.g. Swearington v. California Dep't of Corr. & Rehab., 2014 WL 1671749, at *5, 2014
     U.S. Dist. LEXIS 58757 (E.D. Cal. Apr. 28, 2014) (Plaintiff "claims falsification of medical
26   records [but] . . . offers no facts to suggest that such actions were the result of anything other than
     the exercise of professional judgment or that that judgment was medically unacceptable"), aff'd,
27   624 Fed. Appx. 956, 958 (9th Cir. 2015); Davis v. Paramo, 2017 WL 2578747, at *14, 2017 U.S.
     Dist. LEXIS 91766 (S.D. Cal. June 13, 2017) ("[A]lthough plaintiff claims falsification of his
28   medical records, he offers no facts supporting why and how his medical records were false."),

35

"[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citation and internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. "'[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" Id. at 248-49 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S.253, 288-89 (1968).

Plaintiff has not identified evidence sufficient to put the accuracy of the medical records into genuine dispute within the meaning of Rule 56. A reasonable jury could not find, based on the record presented, that the challenged medical assessments were unsubstantiated. Indeed, the medical record includes plaintiff's own statement that he diverted medication. See ECF No. 144-4 at 36 (Dfs. Ex. B) (Aug. 29, 2010 note plaintiff wrote to Dr. Espinza-Marcus stating, "I admit I haven't been taking my gabapentin."). Also, evidence of plaintiff's prior substance abuse as reflected in his criminal history is consistent with the challenged reports.

Even if there were a dispute of fact as to the accuracy of these records, however, it would not be a material dispute. This case turns on the state of minds of the defendants when they made or endorsed decisions regarding morphine at CSP-SOL. Statements in earlier medical records are relevant to the deliberate indifference inquiry only to the extent that they constitute information on which defendants may have relied. If a defendant relied on information from past providers,

---

report and recommendation adopted, 2017 WL 2959170 (S.D. Cal. July 11, 2017); Warzek v. Onyeje, 2020 WL 1865186, at *9, 2020 U.S. Dist. LEXIS 65567 (E.D. Cal. Apr. 14, 2020) (report and recommendation) ("[A]lthough plaintiff claims falsification of his medical records, he offers no evidence to support his contention, and plaintiff does not have an independent right to an accurate prison record." (Citations omitted).); see also Bartholomew v. Traquina, No. 10-cv-03145 EFB P, 2011 WL 4085479, at *3, 2011 U.S. Dist. LEXIS 103574 (E.D. Cal. Sept. 13, 2011) ("The falsification of records itself is insufficient to state a cognizable claim of deliberate indifference to plaintiff's serious medical needs.").

1   the inaccuracy of the information – even if proved – would not be probative of deliberate

2   indifference.  To the contrary, defendants were obligated to review and consider all of plaintiff's

3   medical records in making their own medical findings, assessments and treatment decisions.

4   Reliance on inaccurate medical records could only support deliberate indifference if the

5   inaccuracy was subjectively known to the defendant, and deliberately disregarded without

6   concern for the risk thereby posed to plaintiff.  There is no evidence of that here, as discussed

7   further below.

8                    **C.      Deliberate Indifference: Individual Defendants**

9          The narrow question before this court is whether there is a triable issue of fact regarding

10   the allegations that defendants were deliberately indifferent to plaintiff's serious medical needs

11   when they tapered, discontinued and/or refused to prescribe him morphine.  See Compl., ECF No.

12   38 at 3-8, 132-33.  More specifically, plaintiff contends that defendants failed to abide by the

13   decisions of his medical specialists, neurologist Dr. Mitchell who prescribed morphine to

14   plaintiff, and rheumatologist Dr. McAlpine who endorsed that prescription.  Id.  Deliberate

15   indifference can be shown by the denial or delay of medical care or intentional interference with

16   prescribed treatment.  Estelle, 429 U.S. at 104-05.  The question on summary judgment is

17   whether there is sufficient evidence to put to a jury that the morphine recommendations were

18   overridden with the requisite culpable state of mind.

19                         **1.      Dr. Lipson**

20          The evidentiary record demonstrates that Dr. Lipson sought extensive diagnostic

21   evaluations to assess plaintiff's several medical conditions and prescribed numerous medications

22   and other treatments in an effort to reduce plaintiff's pain.  Upon assuming plaintiff's care as his

23   PCP at CSP-SOL in May 2011 – and until Dr. McAlpine recommended tramadol in February

24   2012 and Dr. Mitchell prescribed morphine in March 2012 – Dr. Lipson declined plaintiff's

25   requests to prescribe narcotic pain medications.  Dr. Lipson's reasons included not only plaintiff's

26   prior medication diversion but his "good musculature throughout" and plaintiff's reports that he

27   was "still working out."  ECF No. 144-4 at 64, 72-3.  Dr. Lipson opined that plaintiff's "muscular

28   physique indicated that he still was participating in intense workouts at a level that exacerbated

1   his conditions and contributed to his pain." Lipson Decl. ¶ 11 (ECF No. 144-4 at 144).  Plaintiff

2   has presented no evidence to support a reasonable inference that Dr. Lipson's decision not to

3   prescribe narcotic medications during this period was "medically unacceptable" or reflected a

4   "conscious disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330,

5   332 (9th Cir. 1996).

6          When Dr. McAlpine recommended tramadol for plaintiff in February 2012, Dr. Lipson

7   prescribed it.  ECF No. 144-4 at 56-7; Lipson Decl. ¶¶ 16-7 (ECF No. 144-4 at 145).

8          When Dr. Mitchell prescribed morphine for plaintiff in March 2012 (and Dr. McAlpine

9   agreed in April 2012), Dr. Lipson did not interfere, declining only to prescribe tramadol at the

10  same time.  ECF No. 144-4 at 54-5; Lipson Decl. ¶ 19 (ECF No. 144-4 at 145).

11         Due to plaintiff's documented history of medication diversion, Dr. Lipson opined that it

12  was in plaintiff's best interests to taper his morphine prescription after the initial prescription

13  expired on May 5, 2012.  However, in response to plaintiff's emotional distress at this news and

14  Dr. Mitchell's agreement to defer to the assessment of the Pain Committee, Dr. Lipson did not

15  initiate the taper.  Dr. Mitchell renewed the prescription before the Pain Committee meeting,

16  which determined a week later that plaintiff's morphine prescription should be tapered.  On May

17  17, 2012, Dr. Lipson ordered the taper to commence and proceed over a two-week period, noting

18  that this decision reflected the opinion of the "Institutional Pain Committee and Interdisciplinary

19  Assessment."  ECF No. 144-4 at 88.  That decision, though at odds with the opinion of

20  neurologist Dr. Mitchell, included the opinion of rheumatologist Dr. McAlpine, who was also

21  CSP-SOL Chief Physician and Surgeon.

22         A medical decision that overrides the opinion of a specialist is not deliberately indifferent

23  if it is an otherwise "medically acceptable option."  See Colwell v. Bannister, 763 F.3d 1060,

24  1068-70 (9th Cir. 2014); cf. Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012), overruled in

25  part on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014) (rejection of specialist

26  medical opinion may constitute deliberate indifference if based on improper motives unrelated to

27  plaintiff's medical needs).  "[W]here a defendant has based his actions on a medical judgment

28  that either of two alternative courses of treatment would be medically acceptable under the

1  circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." Jackson v.

2  McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted).  The record is devoid of evidence

3  that the specialist's opinion was rejected in favor of a "medically unacceptable" option.

4       Additionally, the record does not support a finding of harm to plaintiff as a result of the

5  morphine taper initiated by Dr. Lipson on May 17, 2012, which led to the discontinuation of

6  plaintiff's morphine approximately June 1, 2012.  "[A] prisoner can make no claim for deliberate

7  medical indifference unless the denial was harmful."  McGuckin, 974 F.2d at 1060.  Plaintiff had

8  access to all of his other pain medications during this period, and Dr. Mitchell again prescribed

9  morphine three weeks later, on June 21, 2012.  Thereafter, until his departure from CSP-SOL in

10  January 2013, Dr. Lipson deferred to Dr. Mitchell's decision to prescribe morphine to plaintiff.

11  Dr. Lipson also prescribed tramadol for plaintiff during the same period.

12       "'[A] plaintiff's showing of nothing more than a difference of medical opinion as to the

13  need to pursue one course of treatment over another [is] insufficient, as a matter of law, to

14  establish deliberate indifference.'"  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012)

15  (quoting Jackson, 90 F.3d at 332)).  For the foregoing reasons, the undersigned finds that no

16  reasonable trier of fact could find Dr. Lipson's initial refusal to prescribe plaintiff morphine or his

17  later taper of Dr. Mitchell's morphine prescription, resulting in a three-week suspension of

18  plaintiff's morphine, were acts taken in conscious disregard of plaintiff's serious medical needs.

19  Accordingly, the undersigned recommends that summary judgment be granted for defendant Dr.

20  Lipson.

21          **2.**    **Dr. McCue**

22       Plaintiff contends that after the May 16, 2012 decision of the CSP-SOL interdisciplinary

23  committee, all of the remaining defendants – Drs. McCue, Kuersten, Tan and Austin – "embarked

24  on a directive to undermine the decisions made by Dr. McAlpine, and Neurology specialist Dr.

25  Mitchell's course of pain management treatment[.]"  Compl., ECF No. 38 at 7.  In opposition to

26  the pending motions, plaintiff argues that "Dr. McCue having been in a position of authority

27  during the dates in question could of [sic] interceded on my behalf."  ECF No. 149 at 5.

28  ////

1    Dr. McCue was, at this time, both a rheumatologist and CSP-SOL Chief Medical

2  Executive.  Dr. McCue's initial contact with plaintiff on January 24, 2012 was initiated by Dr.

3  Lipson's request that McCue conduct a "high-risk evaluation" of plaintiff's medical and treatment

4  needs.  Dr. McCue found Dr. Lipson's treatment plan was "medically appropriate" and that

5  "morphine was not medically indicated" to treat plaintiff's complaints of chronic pain.  ECF No.

6  144-4 at 76-7; McCue Decl. ¶ 8 (ECF No. 144-4 at 138).  Dr. McCue recommended a

7  prescription for Cymbalta, requested that Dr. McAlpine also look into plaintiff's care, and noted

8  that plaintiff's care would be the subject of an upcoming pain management committee meeting.

9  Id.

10    Dr. McCue attended the May 16, 2012 pain committee meeting and sat in on "an

11  interdisciplinary committee and pain-management committees that discussed the preferred course

12  of treatment to manage Mazza's complaints of chronic pain in light of his known medical

13  history."  McCue Decl. ¶ 9 (ECF No. 144-4 at 138).  Dr. McCue avers that, although he did not

14  direct plaintiff's care, he "agreed with the course of treatment advised by Mazza's treating

15  physician."  Id.  Dr. McCue left CSP-SOL in September 2012.  Id. ¶ 1.

16    Dr. McCue involvement in plaintiff's treatment was limited to his assessment that Dr.

17  Lipson's medical care of plaintiff was appropriate.  In the absence of any evidence supporting a

18  reasonable inference that Dr. Lipson's care of plaintiff was "medically unacceptable" or evinced a

19  "conscious disregard of an excessive risk to [his] health," Jackson, 90 F.3d at 332, Dr. McCue's

20  agreement with Dr. Lipson's care also fails to demonstrate deliberate indifference.  Cf. Taylor v.

21  List, 880 F.2d 1040, 1045 (9th Cir. 1989) (supervisors may be liable only if they "participated in

22  or directed" constitutional violations or" knew of the violations and failed to act to prevent

23  them").  Accordingly, the undersigned recommends that summary judgment be granted for

24  defendant Dr. McCue.

25    **3.    Dr. Tan**

26    In addition to his allegations that all defendants undermined the treatment decisions of

27  Drs. Mitchell and McAlpine, Compl., ECF No. 38 at 7, plaintiff generally contends that Dr.

28  Tanacted in concert with the other defendants to take an active part in the actions that triggered

1    this complaint.  Plaintiff points out that Dr. Tan's name recurs in the record of plaintiff's health

2    care appeals, reflecting his involvement.  ECF No. 149 at 5-6.

3         The record shows that Dr. Tan participated in two of plaintiff's administrative appeals.

4    Dr. Tan initially interviewed and examined plaintiff on March 19, 2013, on the First Level

5    Review of his administrative appeal Log No. SOL HC 13037465.  Compl., ECF No. 38 at 91-2.

6    Plaintiff sought a neurosurgery referral for his neck and implementation of Dr. Parmar's January

7    8, 2013 telemedicine suggestion plaintiff be prescribed oxycontin rather than morphine.[13]  Dr.

8    Tan found that neither a neurosurgery referral nor an oxycontin prescription were warranted

9    based on plaintiff's overall strength and ability to vigorously exercise.  Nevertheless, Dr. Tan

10   partially granted the appeal on the ground that he referred plaintiff to Dr. Mitchell and his PCP

11   for further evaluation.

12        Dr. Tan next interviewed and examined plaintiff on December 12, 2013, as part of a

13   Second Level Review of his administrative appeal Log No. SOL HC 13038044.  ECF No. 144-4

14   at 110, 113.  Plaintiff sought to reinstate his morphine prescription.  Rather than reach an

15   immediate decision, Dr. Tan chose to present plaintiff's request to the Pain Committee which met

16   five days later on December 17, 2013.  The Committee denied plaintiff's request, which Dr. Tan

17   recounted in a December 19, 2013 Progress Note.  Id. at 110.  Although Dr. Tan's notes were not

18   included in the final decision, the formal Second Level Response reached the same conclusion.

19        In both of these instances Dr. Tan submitted plaintiff's request to reinstate his morphine

20   prescription to more knowledgeable medical sources, first to Dr. Mitchell, then to the eleven-

21   member CSO-SOL Pain Committee.  These actions demonstrate that, notwithstanding his own

22   professional assessments, Dr. Tan endeavored to obtain the most appropriate medical treatment

23   for plaintiff's pain symptoms.  More broadly, Dr. Tan's participation in reviewing plaintiff's

24   administrative appeals does not, without more, support a cognizable claim.[14]  Accordingly, the

25   _____

26   [13]  Plaintiff's reliance on Dr. Parmar's telemedicine renewal of his morphine prescription on
     January 8, 2013 is of limited relevance.  The single-page, sparsely worded, "Office Visit Note"
27   noted both plaintiff's complaint of increased neck pain and the fact that he remained "physically
     active;" Compl., ECF No. 38 at 66.

28   [14]  A prisoner has no constitutional right to a grievance procedure and therefore no right to a
     favorable response.  See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), cert. denied, 541

1    undersigned recommends that summary judgment be granted for defendant Dr. Tan.

2                          **4.      Dr. Kuersten**

3         Plaintiff contends that Dr. Kuersten "deviated from an ethical course in medicine when

4    assuming the role as my PCP, took the authoritative position to foment further abuse that

5    originated from Lipson's chart note and allegations of 'aggressive exercise' and physique. . . .

6    [H]e overrode the treatment plan of the previous CME, Dr. McAlpine, neurology specialist Dr.

7    Mitchell and pain management specialist Dr. Parmar [.]"  ECF No. 149 at 5.

8         Dr. J. Kuersten has been CSP-SOL Chief Medical Executive (CME) since July 23, 2013;

9    he became Acting CME on April 13, 2013.  The record reflects three occasions when Dr.

10   Kuersten rejected plaintiff's requests for morphine.  The first occasion was on June 5, 2013, when

11   Dr. Kuersten, as Acting CME, received notification that plaintiff's prescription for morphine had

12   expired.  As set forth at length supra, Dr. Kuersten undertook a comprehensive review of

13   plaintiff's medical records and contacted Dr. Mitchell to determine his rationale for prescribing

14   morphine.  As reported by Dr. Kuersten, Dr. Mitchell informed him "that he may have felt

15   somewhat pressured by Mazza to prescribe morphine and that he had no objection to its

16   discontinuation, especially if discontinuation was recommended by the pain committee, which it

17   was." ECF No. 144-4 at 96-7; Kuersten Decl. ¶¶ 6-12 (ECF No. 144-4 at 131-32).  Dr. Kuersten

18   met with plaintiff the next day, on June 6, 2013, and informed him that a morphine taper would

19   begin.  Id.  Dr. Mitchell himself began the taper on June 27, 2013.  ECF No. 144-4 at 100.  Thus,

20   at this juncture, none of plaintiff's medical providers were endorsing a prescription for morphine.

21        Dr. Kuersten's second involvement with plaintiff's care was his attendance at a December

22   17, 2013 pain committee meeting with ten other staff members.  The committee as a whole

23   considered Dr. Tan's presentation of plaintiff's conditions and treatments and concluded that the

24   risks outweighed the benefits of prescribing him morphine.  ECF No. 144-4 at 110, 113. As in

25   U.S. 1063 (2004); accord, George v. Smith, 507 F.3d 605, 609-10 (7th Cir. 2007) ("[r]uling
     against a prisoner on an administrative complaint does not cause or contribute to [a constitutional]
26   violation"); Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (prison official whose only role
     involved the denial of a prisoner's administrative grievance cannot be held liable under Section
27   1983), cert. denied, 530 U.S. 1264 (2000); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)
     (a "prison grievance procedure is a procedural right only, it does not confer any substantive right
28   upon the inmates") (internal punctuation omitted).

1    June 2013, the decision reflected no disagreement among plaintiff's medical providers.

2         The third and last involvement Dr. Kuersten had with plaintiff, as reflected in the record,

3    was his Second Level Review of plaintiff's 2015 administrative appeal, Log No. SOL-HC-

4    15040586.  Kuersten Decl. ¶ 13 (ECF No. 144-4 at 133-34).  Dr. Mitchell had, on January 30,

5    2014, recommended the resumption of plaintiff's morphine prescription.  Compl., ECF No. 38 at

6    130; ECF No. 144-4 at 124.  Nevertheless, this advice was rejected by plaintiff's CSP-SOL

7    medical providers, as confirmed in Dr. Kuersten's administrative response.  Dr. Kuersten

8    endorsed the findings on First Level Review by Dr. Mulligan-Pfile that plaintiff "continued to

9    engage in vigorous and frequent exercise, had well-developed musculature, and displayed no

10   apparent functional limitations.  [Also] . . . Mazza's urine had recently screened positive for

11   methadone, even though he was not being prescribed it at the time.  Dr. Mulligan-Pflle did not

12   conclude that either treatment with morphine or any other additional treatment was medically

13   indicated."  Kuersten Decl. ¶ 13 (ECF No. 144-4 at 133-34).  Dr. Kuersten's decision was

14   supported by his assessment of the risks and benefits of prescribing morphine to patients with

15   histories of substance abuse or mental illness.  Kuersten Decl. ¶ ¶ 3-4 (ECF No. 144-4 at 131).

16        This evidence shows that Dr. Kuersten actively engaged in the assessment of plaintiff's

17   subjective complaints of pain, his ongoing physical activity, and his medical care to conclude that

18   plaintiff was effectively treated without morphine.  "Eighth Amendment doctrine makes clear that

19   a difference of opinion between a physician and the prisoner – or between medical professionals –

20   concerning what medical care is appropriate does not amount to deliberate indifference.  Rather,

21   to show deliberate indifference, the plaintiff must show that the course of treatment the doctors

22   chose was medically unacceptable under the circumstances and that the defendants chose this

23   course in conscious disregard of an excessive risk to the plaintiff's health."  Hamby v. Hammond,

24   821 F.3d 1085, 1092 (9th Cir. 2016) (citations and internal quotation marks omitted).  Here Dr.

25   Kuersten concluded that again prescribing morphine created greater risks to plaintiff than

26   refraining from doing so.  Neither plaintiff's difference of opinion with Dr. Kuersten, nor Dr.

27   Mitchell's intermittent recommendation for morphine, demonstrate that Dr. Kuersten's decisions

28   were medically unacceptable.  Therefore, the undersigned recommends that summary judgment

43

1    be granted for defendant Dr. Kuersten.

2    **5.**     <u>CEO Austin</u>

3        Plaintiff named defendant Austin in her role as CSP-SOL Medical Department's Chief

4    Executive Officer (CEO) and alleged that she was "legally responsible" for the other defendants'

5    challenged conduct.  Compl., ECF No. 28 at 2.  Plaintiff contends that as CEO Austin "was aware

6    and participated in my health care by screening my HC 602s and not intervening when it should

7    of [sic] been appropriate."  ECF No. 149 at 5.

8        Defendant Austin contends that, because she is not a physician, she cannot be held

9    responsible for treatment decisions over which she had no authority.  ECF No. 144-1 at 9.  Austin

10   avers that in her role as CEO she was neither knowledgeable nor responsible for assessing the

11   quality of inmates' medical care.[15]  Rather, as previously set forth, "the scope of [her] review was

12   purely administrative and was limited to overseeing compliance with the appeals process." Austin

13   Decl. ¶ 7 (ECF No. 144-4 at 155).  More specifically, defendant Austin avers that she "was never

14   responsible for, nor authorized to, diagnose or treat inmate Bryan Mazza," "never sat in on or

15   participated in Mazza's pain-management committee meetings," and "never interfered with or

16   delayed the care directed by his treating physicians."  <u>Id.</u>  ¶ 6.

17        Prison officials, particularly those in administrative positions, may be "liable for

18   deliberate indifference when they knowingly fail to respond to an inmate's requests for help."

19   <u>Jett</u>, 439 F.3d at 1098 (citations omitted).  A correctional official with supervisory authority who

20   is informed of an alleged constitutional violation, e.g. when reviewing an inmate's administrative

21   appeal, may be held responsible for failing to remedy such violation.  <u>Id</u>.

22        The only appeal identified by the parties in which Austin participated resulted in plaintiff

23   receiving all of the relief he requested except for assignment of a new PCP.  <u>See</u> Compl., ECF

24

---

25   [15]  Defendant Austin avers that "[w]hen reviewing inmate health-care appeals . . . I was not
authorized to, and did not, evaluate the substance of the response or the medical care provided"

26   and "did not review the inmate's medical records or clinical findings" but relied on the expertise
of medical staff who were assigned to address the substantive health care issues.  Austin Decl. ¶ 4

27   (ECF No. 144-4 at 155).  Austin explains, "I am not a doctor and I am not licensed to prescribe
medications.  I have no authority to overrule treatment determinations made by physicians or to

28   direct a physician to follow any particular course of treatment."  <u>Id.</u> ¶ 5.

1   No. 38 at 99, 101-02 (Aug. 28, 2012 Second Level Response to plaintiff's appeal Log No. SOL

2   HC 12036635).  No reasonable trier of fact could find that this appeal informed Austin of a

3   violation of plaintiff's Eighth Amendment rights which she disregarded.  There are no other

4   pertinent allegations against defendant Austin.  There is no *respondeat superior* liability in § 1983

5   cases, <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978), so Austin cannot be liable on the

6   theory that she is responsible as CEO for the actions of subordinate staff; this would be the case

7   even if she had supervisory authority over medical treatment, which she did not.  For these

8   reasons, the undersigned recommends that summary judgment be granted for defendant Austin.

9          **D.**   <u>**Summary**</u>

10       Careful review of plaintiff's substantial medical record demonstrates that he has been

11   regularly provided care for his serious medical needs, including diagnostic imaging, medication,

12   physical therapy, and specialist referrals.  The decisions to deny plaintiff morphine were based on

13   numerous medically appropriate factors, including plaintiff's documented higher risk of abuse.

14   All of the defendants sought to reduce plaintiff's pain with treatments and modalities other than

15   morphine.  As noted by defendants' medical expert, these decisions were consistent with the

16   consensus of authoritative medical experts reflected in the CDC Guidelines for Prescribing

17   Opioids for Chronic Pain that, as a general rule, the risks of prescribing morphine to relieve

18   chronic non-cancer pain outweigh the benefits.  Barnett Decl. ¶ 36.  For these reasons, and the

19   many others set forth above, the undersigned finds that no jury could find that any of the medical

20   decisions challenged in this case reflect deliberate indifference to plaintiff's serious medical

21   needs.

22          **VII.**   <u>**Conclusion**</u>

23       For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

24       1.  Defendants' motions for summary judgment, ECF Nos. 143 and 144, be GRANTED;

25       2.  Judgment be entered for defendants Lipson, McCue, Kuersten, Austin and Tan; and

26       3.  The Clerk of Court be directed to close this case.

27       These findings and recommendations are submitted to the United States District Judge

28   assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one (21)

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 23, 2020

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE